**Michael Anthony PEAK, Appellant,**

v.

**COMMONWEALTH OF KENTUCKY, Appellee.**

**and**

**Patrick W. Meeks, Appellant,**

v.

**Commonwealth of Kentucky, Appellee.**

No. 2003–SC–0244–MR, 2003–SC–0271–MR.

Supreme Court of Kentucky.

June 15, 2006.

As Modified Aug. 2, 2006.

As Modified on Grant of Modification and Denial of Rehearing Aug. 24, 2006.

Donna L. Boyce, Appellate Branch Manager, Department of Public Advocacy, Frankfort, Counsel for Appellant Peak.

Gregory D. Stumbo, Attorney General of Kentucky, Todd D. Ferguson, Dennis W. Shepherd, Assistant Attorneys General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee.

Shelly R. Fears, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Patrick W. Meeks, Pro se, Burgin, Counsel for Appellant Meeks.

WINTERSHEIMER, Justice.

Peak appeals from a judgment based on a jury verdict that convicted him of intentional murder, first-degree robbery, conspiracy to commit murder and tampering with physical evidence. He was sentenced to life in prison without the possibility of probation or parole for twenty-five years.

Meeks appeals from a judgment based on a jury verdict that convicted him of wanton murder, first-degree robbery, conspiracy to commit murder and tampering with physical evidence. He also was sentenced to life in prison without the possibility of probation or parole for twenty-five years.

These appeals have been consolidated in order to render one opinion. The two defendants raise numerous issues, some of which are the same. We will first address the individual issue(s) raised by Meeks and Peak and then address their shared issues.

The question presented by Meeks is whether the trial judge erred in refusing to suppress his taped statement to the police.

The questions presented by Peak are whether the unredacted statement given by Meeks was improperly admitted; whether there was an impermissible reference to a polygraph exam; whether the trial judge erred in excluding evidence about the destroyed farmhouse or by failing to give a missing evidence instruction; whether he was entitled to an instruction on accomplice testimony; and, whether the evidence was constitutionally sufficient to support the verdict.

The questions presented by both defendants are whether the trial judge erred in reducing the number of peremptory challenges; whether the psychological records of a third co-defendant should have been provided to Meeks and Peak; whether the alleged omission of an oath or affirmation to a witness was palpable or structural error; whether demonstrative exhibits were improperly shown to the jury; whether the trial judge was divested of jurisdiction because the aggravating circumstances were not charged in the indictment; and, whether an alleged inconsistent recommendation by the jury as to sentencing resulted in error.

Peak, Meeks and a third co-defendant, Bearden, were charged with murdering, robbing and conspiring to murder an unidentified victim following the discovery of his skeletal remains in a dry creek bed. Peak and Meeks were also charged with tampering with physical evidence. All three individuals were tried together. Bearden testified at trial against her two co-defendants and in exchange for that testimony the Commonwealth agreed not to seek the death penalty against her. Among other evidence, the Commonwealth also presented the incriminating taped statement Meeks gave to the police.

The evidence at trial indicated that the three co-defendants had previously purchased or obtained drugs from the unidentified victim. After learning that he was trying to sell a kilogram of cocaine, they conspired to murder him and rob him of his drugs. Bearden claimed that the idea was first proposed to her by Meeks. In the taped statement given by Meeks, he originally suggested that Bearden and possibly Peak devised the plan, but later stated he didn't know who came up with it. Although he admitted that they talked about killing the victim, he claimed that in his mind they were only going to rob him.

The plan was soon put into action. Meeks obtained a gun and gave it to Peak. Bearden and Meeks then dropped Peak off at an abandoned farmhouse where Meeks once lived. Next, Bearden telephoned the victim and told him that she had a buyer for his cocaine. Having convinced him, she and Meeks transported the victim to the farmhouse where Peak lay in waiting. When the victim entered, Peak shot him multiple times and stabbed him in the back of the neck. After the victim was killed, the three co-defendants cleaned up the crime scene: Peak, Meeks and a third individual, Cissell, who was granted immunity in exchange for his testimony, eventually disposed of the body of the victim in a dry creek bed.

Peak and Meeks were convicted of all the charges. The only difference was that Meeks was convicted of wanton murder and Peak was convicted of intentional murder. They were both sentenced to life in prison without the possibility of probation or parole for twenty-five years for murder, twenty years for first-degree burglary and five years for tampering with physical evidence. Meeks was sentenced to ten years for conspiracy to commit murder and Peak was sentenced to twenty years for the same charge. All the sentences were eventually ordered to run concurrent by the trial judge. These consolidated appeals followed.

I. Suppression of Statement by Meeks

 Meeks argues that the trial judge committed reversible error in refusing to suppress his statement to the police on the night of his arrest because it was not knowingly, intelligently, and voluntarily given. He contends that the tactics used by the detective were objectively coercive. Meeks also asserts that he unequivocally asserted his right to counsel. We disagree.

The trial judge held a hearing on the motion to suppress at which Meeks testified as did the two police detectives that interviewed him. Following the hearing, the trial judge made findings of fact and conclusions of law and denied the motion. Our review of the record demonstrates that those findings are supported by substantial evidence and thus, they are conclusive. RCr 9.78. We offer a brief summary of the facts from the hearing:

Meeks was arrested at 10:45 p.m. and signed a waiver of his Miranda rights at 10:55 p.m. He was then questioned by police from that point until 2:03 a.m. The questioning started again at approximately 5:00 a.m. and lasted until 6:42 a.m. Only the last half hour of each session was tape recorded.

Meeks testified at the suppression hearing that he awoke for work on the day of his arrest at 4:30 a.m. and remained awake twenty-six hours straight when the questioning by police ended. He complained that during the questioning he did not move around the room; was constantly yawning and nodding off; and, was physically and mentally exhausted. Meeks claimed that one of the detectives told him to cooperate and the judge would be told of the cooperation. He also alleged that he told the detective that he was scared and that he thought he needed to talk to an attorney.

On cross-examination, Meeks admitted that he had been talking to a detective for about an hour when he placed himself at the murder scene. He also acknowledged that he was allowed to go to the bathroom; did not ask for any food; and, was provided with a cigar to smoke.

A detective testified that Meeks was offered both food and the ability to take breaks. He stated that between interview sessions, he saw Meeks sleeping with his head down. The detective also said that

Meeks had no problem drawing a detailed diagram of the crime scene during the second interview session. He stated he made no threat or promises to Meeks to get his statement and that he only told him that he would tell the court that he was cooperative. A second detective said he saw Meeks yawn, but never saw him nod off. One detective testified that Meeks never discussed a need for a lawyer.

In his first taped statement, Meeks admitted that he was given the opportunity to take breaks, to smoke and to get something to drink. In his second taped statement, Meeks acknowledges being coherent and that he was given frequent breaks. He does indicate a lack of sleep, but states that it did not affect his ability to tell the truth.

The confession of Meeks was voluntary. *Mills v. Commonwealth*, 996 S.W.2d 473 (Ky.1999). There is no evidence of police coercion of a confession obtained by physical violence or a deliberate means calculated to break the will of Meeks. *See Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). The detective did not make threats or promises to Meeks to obtain his confession. His representation that he would inform prosecuting authorities of his cooperation does not render the confession involuntary. *See Skaggs v. Commonwealth*, 694 S.W.2d 672 (Ky.1985). Meeks was not deprived food, drink or the ability to take breaks. Although he may have been tired, he was not forced to stay awake. As correctly determined by the trial judge, Meeks was not so exhausted from a lack of sleep so as to make his confession involuntary.

The Commonwealth demonstrated by a preponderance of the evidence that Meeks waived his Miranda rights. A statement is not compelled for Fifth Amendment purposes if an individual vol-

untarily, knowingly and intelligently waives his constitutional privilege. *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Mills, supra.* Meeks signed a written waiver of his rights before being questioned by police.

There is no evidence that Meeks was incapable of comprehending the waiver of rights. He admitted to being coherent and that his ability to tell the truth was not affected by his tiredness. The totality of the circumstances reveals that Meeks made an uncoerced choice to relinquish his rights and did so with the requisite level of comprehension. *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

His allegation that he told the detectives that he thought he needed to talk to an attorney is unsubstantiated. Nowhere in the two taped statements does Meeks mention the need for an attorney. Moreover, one detective testified that he never made such a request. The determination by the trial judge that Meeks never asked for an attorney is supported by substantial evidence. It is unnecessary for us to address the alternative position offered by the trial judge that Meeks statement concerning an attorney was ambiguous.

Under the totality of the circumstances, the execution of a waiver of rights by Meeks and his subsequent questioning were constitutionally permissible. The trial judge did not err in overruling the motion by Meeks to suppress his confession.

## II. Introduction of Statement From Meeks

█ Peak claims that the trial judge erred by permitting the introduction of the unredacted statement given by Meeks. We disagree.

After his arrest, Meeks gave an extensive taped statement to the police implicating himself as well as his two co-defendants. Four weeks into the joint trial, the Commonwealth made significant efforts to produce a redacted version of the statement that could be introduced against Meeks without prejudicing Peak. Meeks objected to the redacted version of the tape because he felt it made him look to be the trigger man. Instead, he demanded that the full unredacted version be played. He waived his 5th Amendment rights and moved to have the audiotape of the statement played in its original form. Peak then requested bifurcation, mistrial or alternatively, to have portions of the statement redacted. The trial judge denied Peak's requested relief. Peak then objected to playing the tape without Meeks taking the stand and testifying. The trial judge overruled the objection and later denied a second motion for mistrial.

The trial judge made an inquiry concerning the waiver of Meeks' Fifth Amendment rights. The prosecution clarified with the trial judge that there was no agreement regarding Meeks testifying. The trial judge concurred with the parties that anyone involved could call Meeks as a witness subsequent to the waiver of his Fifth Amendment rights against self-incrimination.

Following the testimony of the police officer who interviewed Meeks, the Commonwealth played the taped interview. The Commonwealth moved to prohibit Meeks and Peaks from conferring with each other claiming the benefits of the separation of witnesses rule while contending that Peak was attempting to intimidate Meeks to prevent his testimony. The trial judge cautioned defense counsel concerning continued conferring between the two defendants.

Every case involving multiple defendants raises the possibility that evidence which would be properly admitted in a trial of a single defendant would be improper in a separate trial of a co-defendant. Such evidence should be closely reviewed prior to admission because of the potential effect on a co-defendant. There is no question that the waiver by Meeks and the hearsay exception provided by KRE 801A(b)(1) would allow the statement to be admitted against Meeks.

■ Any Confrontation Clause analysis is fundamentally a question of whether the accused was allowed to be confronted with the witnesses against him. U.S. Const. Amend. VI. We require live testimony in court subject to adversarial testing. *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Although cross-examination is a method typically used by counsel to tease out the truth of a matter, it is not the only method available. *Id.* at 67, 124 S.Ct. 1354. Confrontation and not any particular formalized method of confrontation is how the determination of the reliability of testimonial statements is achieved. *See id.* at 69, 124 S.Ct. 1354, *Commonwealth v. Willis*, 716 S.W.2d 224 (1986). "The Confrontation Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford v. Washington*, 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

The trial judge ruled in a manner that applied the hearsay exception rules properly and afforded Peak the opportunity to test the truth of the statement before the jury by calling Meeks as a witness. He had no duty to call Meeks as a witness but certainly had the opportunity. Had Peak called Meeks to the stand he could certainly have been called as a hostile witness. He could then have been questioned with leading questions as if on cross-examination. KRE 611(c). Peak was present at the entire trial. He chose not to avail himself of that opportunity and waived his right to confrontation. *See Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

Even if error arose, it was harmless, however, we need not determine whether harmless error analysis should be applied to this situation because there was no error. *Cf. Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). In any event both defendants received a fair trial.

## III. Polygraph Exam

Peak contends that during the cross-examination of Bearden by counsel for Meeks, it was improperly inferred that Bearden passed a polygraph examination that she allegedly failed. This issue is completely without merit. Peak cites a lengthy exchange between Bearden and defense counsel for Meeks, the gist of it being that Bearden testified that she was interviewed by a detective and answered several questions posed to her. She also confirmed that she was informed that if she was deceptive with the prosecution, the death penalty could be pursued. There is no mention of a polygraph in any form or fashion during the exchange. The inference created by Peak is beyond strained. There was no error.

## IV. Farmhouse

■ Peak asserts that the trial judge erred by excluding evidence of and from the farmhouse where the murder and robbery were committed or by failing to give a missing evidence instruction to the jury. We disagree.

The corporation that owned the land on which the farmhouse was located signed a conditional consent permitting the police to search the house and the surrounding

grounds. The police agreed to conclude their search by October 25, 2000 and not to interfere or intervene in any destruction of the farmhouse by the owner if, after November 11, 2000, it elected to do so. The house was destroyed sometime before the defendants were indicted.

Peak has not demonstrated any prejudice in the destruction of the farmhouse. The structure was not evidence and the claim that exculpatory evidence may have been found inside is pure speculation. Even if we were to conclude that the destruction was improper, Peak has utterly failed to demonstrate that the Commonwealth acted in bad faith. *See Perdue v. Commonwealth,* 916 S.W.2d 148 (Ky.1995). A missing evidence instruction would not have been proper in this case. *See Estep v. Commonwealth,* 64 S.W.3d 805 (Ky.2002), which states that absent some degree of bad faith a defendant is not entitled to an instruction that the jury may draw an adverse inference from the failure to preserve or collect any evidence. No error occurred.

## V. Instruction on Accomplice Testimony

 Peak was not entitled to an instruction cautioning the jury on accomplice testimony. He sought, but did not tender, an instruction that advised the jurors that Meeks, Bearden and Cissell were accomplices and that their testimony was of questionable integrity and must be carefully weighed in view of their motive and bias. Kentucky follows the "bare bones" principle when it comes to jury instructions. *Hodge v. Commonwealth,* 17 S.W.3d 824 (Ky.2000), *cert. denied,* 531 U.S. 1018, 121 S.Ct. 581, 148 L.Ed.2d 498 (2000). The instruction sought by Peak overemphasizes particular aspects of the evidence. Evidentiary matters should be omitted from the instructions and fleshed out during closing arguments. *Id.* The

trial judge properly denied the requested instruction.

## VI. Sufficiency of Evidence

 The evidence was constitutionally sufficient to support the verdict despite an alleged lack of physical evidence connecting Peak to any of the charged offenses. The test for a directed verdict is whether, drawing all fair and reasonable inferences from the evidence in favor of the Commonwealth, the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty. *Commonwealth v. Benham,* 816 S.W.2d 186 (Ky.1991).

 Here, among other evidence, the Commonwealth presented the testimony of Bearden and the taped statement of Meeks. Both were consistent with respect to Peak's involvement in the crimes. A conviction can be sufficiently supported even by the uncorroborated testimony of an accomplice. *Hodge, supra, citing Murphy v. Commonwealth,* 652 S.W.2d 69 (Ky. 1983), *cert. denied,* 465 U.S. 1072, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984). The absence of physical evidence is partially explained by the testimony that Peak participated in cleaning the crime scene and disposed of the gun as well as the body of the victim. The evidence was sufficient to support the convictions.

## VII. Peremptory Challenges

 Meeks and Peak complain that the trial judge erred by reversing a prior ruling and reducing the number of peremptory challenges available to each defendant one week into voir dire. We disagree.

Following a discussion with the parties, the trial judge originally designated nine peremptory strikes for each of the three defendants and twelve for the Commonwealth. During voir dire and before any strikes were made, the lead prosecutor

informed the court that she was not in the courtroom when that discussion took place. She pointed out that the number of strikes did not comport with the law and gave too many to the defendants.

The trial judge determined that the prior discussion was preliminary and not binding. He admitted his mistake and concluded that the co-defendants were entitled to fifteen peremptory strikes and the Commonwealth to nine. Three more peremptory strikes were granted to the defense, one per defendant, for a total of eighteen.

There is no question that the trial judge eventually granted the defendants the correct number of peremptory challenges. *See* RCr 9.40. *See also Springer v. Commonwealth,* 998 S.W.2d 439 (Ky.1999). Neither defendant offers any convincing argument that they were prejudiced by his ultimate ruling. CR 47.03 which deals with peremptory challenges in civil matters has no application here. There was no error or abuse of discretion.

### VIII. Psychological Records

■ Peak and Meeks claim that the trial judge erred by denying their motion for access to the psychological records of Bearden. We disagree.

Prior to the testimony of Bearden, counsel for Meeks asked that he be given the psychological records of Bearden. Specifically, he asked that it be produced "... in terms of a consistent or inconsistent statement..." Counsel for Peak joined that request. Counsel for Bearden objected to the records being turned over to the other co-defendants, noting that the report was prepared by a private psychiatrist he retained and was for Bearden's defense. He stated he would not call the psychiatrist who prepared the report in the guilt phase. When the Commonwealth admitted that it had recently received a copy of the report,

Meeks and Peak renewed their claim that they were entitled to it. The trial judge informed the parties he would consider the matter.

A few days later the issue was revisited. Counsel for Meeks asked that the Commonwealth turn over a copy of the report to the trial judge for him to review in camera so he could determine whether the statement by Bearden was a verbatim statement. The trial judge complied with the request after being provided with a copy by counsel for Bearden. Upon review, the trial judge provided Meeks and Peak with a portion of the report that involved what Bearden said about the crimes. He excluded information concerning the psychiatric evaluation. Counsel for Meeks asked that the entire copy of the report be included in the record for appeal purposes and counsel for Peak specifically objected to not having the entire report. The trial judge indicated that the report was privileged and that Bearden had not waived the same by turning it over to the Commonwealth, finding that it was not something she had to turn over.

In *Commonwealth v. Barroso,* 122 S.W.3d 554 (Ky.2003), which was decided after the trial in this case, the Court held that:

(1) If the psychotherapy records of a crucial prosecution witness contain evidence probative of the witness's ability to recall, comprehend, and accurately relate the subject matter of the testimony, the defendant's right to compulsory process must prevail over the witness's psychotherapist-patient privilege, and

(2) In camera review of a witness's psychotherapy records is authorized only upon receipt of evidence sufficient to establish a reasonable belief that the records contain exculpatory evidence.

Initially, it must be noted that the present case is different than *Barroso, supra,* in at least two significant respects. First, although Bearden testified favorably for the Commonwealth, the psychological report was prepared in preparation of her defense. Second, unlike the situation in *Barroso,* the Commonwealth at one point did possess the report. Neither Meeks nor Peak raises any type of Brady violation, nor would the record support such a claim.

The psychological report was originally requested by Meeks and Peak for purposes of examining the statement made by Bearden concerning the crime. The trial judge complied with the request that he review the information in camera and then provided Meeks and Peak with that portion of the report so requested. Following that decision, counsel for Meek indicated that he was entitled to the entire report by asking that it be preserved in the record. Counsel for Peak specifically stated that he believed he was entitled to the entire report. At no time, however, did Peak or Meeks demonstrate sufficient evidence to establish a reasonable belief that the records contained exculpatory evidence.

There is no clear indication that Bearden voluntarily waived the psychotherapist-patient privilege. Her defense counsel did provide the report to the Commonwealth, but he apparently believed, erroneously, that he was compelled to do so. KRE 510 states that a claim of privilege is not defeated by a disclosure that is compelled erroneously or made without the opportunity to claim the privilege. The report has been made part of the record on appeal and was ordered unsealed by this Court. It is obvious from the briefs that appellate counsel for Meeks and Peak have reviewed it.

Having reviewed the psychological report ourselves and the record, we find no error in the decision of the trial judge. Bearden was cross-examined about her extensive drug and alcohol abuse. There is no other information in the report that would be probative of the witness's ability to recall, comprehend, and accurately relate the subject matter of the testimony.

## IX. Swearing In of Witness

There was no palpable or structural error from the alleged failure of the trial judge to swear in the Commonwealth's expert witness, a forensic anthropologist. The parties were at a bench conference when the witness took her seat at the witness stand. There was some type of exchange between the witness and the bailiff, but there is no clear indication on the videotape record that she was sworn in as a witness. None of the parties objected to the alleged omission. The witness proceeded to testify to the victim's physical traits and injuries. Upon consideration of that testimony and the entire record, we can conclude that there was no palpable error. Nor is the failure to administer an oath or affirmation a structural error. *Cf. Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

## X. Demonstrative Evidence

There was no error in allowing the Commonwealth to present the grave wrappings of the victim. During the testimony of a police detective, the Commonwealth introduced several exhibits consisting mainly of blankets and clothing in which the body of the victim had decomposed. The smell of the items apparently necessitated them being sprayed during the presentation with some type of deodorizer. Counsel for Peak, joined by the other two co-defendants, objected to the dra-

matic and unnecessary introduction of the exhibits. The trial judge overruled the objection, stating that the prosecution had a right to put on its case. When counsel for Peak questioned the necessity of the spraying, the prosecutor explained that it was done to mask the smell. That explanation was accepted and the bench conference concluded.

The trial judge correctly determined that the Commonwealth was entitled to introduce the evidence to prove its case. The exhibits did not unfairly inflame the jury. *Cf. Ernst v. Commonwealth*, 160 S.W.3d 744 (Ky.2005). There was no abuse of discretion by the trial judge.

■ Nor was there any error in allowing the presentation of the jaw and shoulder bone of the victim during the testimony of the forensic anthropologist. The three defendants objected to this evidence, suggesting that photographs would be sufficient. The trial judge overruled that objection.

Skeletal remains of a victim are admissible if relevant. *Tamme v. Commonwealth*, 973 S.W.2d 13 (Ky.1998). Here, the Commonwealth offered the remains to illustrate the wounds and to help identify the victim. It was relevant to illuminate the cause of death of the victim and to establish his identity. The probative value of this demonstrative evidence outweighed the prejudice and it did not unfairly inflame the jury. There was no indication that animals had mutilated the body. The trial judge did not abuse his discretion in overruling the objection.

## XI. Jurisdiction/Aggravating Circumstances

■ Meeks and Peak allege that the failure to specifically charge statutory aggravating circumstances in the indictment left the trial judge without jurisdiction to try them on aggravating circumstances or

to sentence them to an aggravated penalty. We disagree.

■ There is no requirement to charge statutory aggravating circumstances in the indictment. *Wheeler v. Commonwealth*, 121 S.W.3d 173 (Ky.2003). The indictment was valid on its face and conformed to statutory requirements. Meeks and Peak were properly notified of the aggravating circumstances prior to trial. The federal authorities cited by the defendants are not contrary to our procedures. In no way was the trial judge divested of jurisdiction under these circumstances.

## XII. Sentencing

■ Peak and Meeks argue that they were denied fair and reliable sentencing when the jury recommended two distinctly different sentences and the trial judge failed to sentence them to the lesser of the two. We disagree.

During the penalty phase, the jury, using separate forms for each defendant, made recommendations as to the sentences to be imposed. On jury verdict form # 2, the jury found the existence of an aggravating circumstance, or circumstances in the case of Peak, and recommended that they be sentenced to life without the possibility of probation or parole for twenty-five years. On verdict form # 6, the jury recommended how the sentences were to be served. In the space provided for murder, the number 25 is written in each case.

On the form for Meeks, it was recommended that his "25" years for murder be served concurrently to the twenty-years for first-degree robbery and consecutively to the ten years for conspiracy and five years for tampering for a total of forty years in prison. As to Peak, the jury recommended that his "25" years for murder be served consecutively to his twenty-years for robbery, twenty years for con-

spiracy and five years for tampering for a total of seventy years.

Neither of the defendants offered a proper objection to the alleged error at trial. It was only raised in a post-trial motion that was denied. Ultimately, the trial judge accepted the recommendation of the jury as to the term for each sentence, specifically, life without the possibility of probation or parole for twenty-five years for the murder, but ran all the sentences concurrent.

 It is clear that the jury recommended that both defendants be sentenced to life without the possibility of probation or parole for twenty-five years for the murder of the victim. Once the jury was polled, none of the defendants contested that fact at trial. The trial judge, who is not bound to accept the recommendation of the jury as to sentencing, *Dotson v. Commonwealth,* 740 S.W.2d 930 (Ky.1987), ultimately imposed that sentence. The confusion arose when the jury was asked to designate consecutive or concurrent terms and to total the terms. The jury improperly represented the life sentence as a twenty-five year term in order to accomplish that task. A sentence for a term of years merges with a life sentence. *Neal v. Commonwealth,* 95 S.W.3d 843 (Ky.2003). The trial judge remedied that situation in the final judgment by running all the terms concurrently.

Peak and Meeks received a fundamentally fair trial. They were not denied any of their due process rights under the state or federal constitutions.

Both judgments of conviction are affirmed.

GRAVES and JOHNSTONE, JJ., concur.

ROACH, J., concurs in result only.

COOPER, J., files a separate opinion concurring in part and dissenting in part in which LAMBERT, C.J., and SCOTT, J. join.

COOPER, Justice, concurring in part and dissenting in part.

I concur with the affirmance of the conviction of Meeks. However, I dissent from the affirmance of the conviction of Peak and would remand his case for a new trial because of a clear violation of the rule announced in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

No doubt, this was a difficult case to try. There were three defendants, all indicted for the capital murder and robbery of an unknown drug dealer whose decomposed remains were found wrapped in a blanket and dumped in a run-off ditch. One defendant, Bearden, had an agreement with the Commonwealth that if she testified truthfully, the death penalty would be "taken off the table" as to her. Another defendant, Meeks, had given an audiotaped post-arrest statement to the police that incriminated both him and Peak (but mostly Peak). Both Meeks and Peak indicated their intent to exercise their respective Fifth Amendment rights not to testify. Thus, because Meeks could not be cross-examined by Peak, the Commonwealth could not introduce those portions of Meeks's statement that inculpated Peak. *Lilly v. Virginia,* 527 U.S. 116, 137–38, 119 S.Ct. 1887, 1900–01, 144 L.Ed.2d 117 (1999); *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

As is often the case, Meeks's statement minimized his own role in the murder and robbery while pointing the finger at Peak as both the planner and the triggerman. No physical evidence connected Peak to the murder and robbery, so the primary evidence against him would be the testimo-

ny of Bearden, an admitted heroin and cocaine addict. In a pretrial ruling, the trial court correctly held that the Commonwealth could not introduce Meeks's unredacted statement. However, the Commonwealth's attempt to produce a redacted version, completed only after several weeks of trial, made it appear as if Meeks had confessed to being the triggerman. At this point, Meeks advised the court that he would waive his Fifth Amendment right not to testify so that the Commonwealth would not read the redacted version of his statement. However, instead of calling the now-available Meeks to the stand and thereby subjecting him to cross-examination by Peak (and running the risk that Meeks might change his story), the Commonwealth simply played the unredacted audiotape of Meeks's statement to the jury. Compounding the error, the jury was allowed to hear the audiotape again during its guilt-phase deliberations.

In *Crawford*, the United States Supreme Court held that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: *unavailability and a prior opportunity for cross-examination.*" *Crawford*, 541 U.S. at 68, 124 S.Ct. at 1374 (emphasis added). The Commonwealth does not assert that Meeks's statement was not testimonial in nature. "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; *and to police interrogations.*" *Id.* at 68, 124 S.Ct. at 1374 (emphasis added). In fact, the statement that required reversal in *Crawford* was also the product of a police interrogation. Meeks's statement violated both aspects of the holding in *Crawford.* Peak did not have a prior opportunity to cross-examine Meeks, and Meeks was not unavailable. "Even where the defendant had such an opportunity [to cross-examine], we excluded the testimony where the government had not established unavailability of the witness." *Id.* at 57, 124 S.Ct. at 1367–68.

The majority opinion suggests that Peak could have cured the error by calling Meeks as a witness during his case-in-chief and asking him about the statement. Of course, it is not the obligation of a criminal defendant to cure a trial court error. Furthermore, Peak's case-in-chief would have been days later, and to call Meeks to the stand for the purpose of examining him about his statement would simply have reminded the jury of those statements that inculpated Peak. Lastly, if Peak had called Meeks as his witness, it would have been on direct examination, and he could not have exercised that primary advantage of cross-examination, *i.e.*, the right to ask leading questions. KRE 611(c). Instead, when the Commonwealth simply played the audiotape of Meeks's unredacted statements, Peak could not cross-examine Meeks at the time of its introduction because Meeks was not on the witness stand. The audiotaped statement was introduced during the testimony of a police officer.

The majority opinion seeks solace from a statement taken out of context from a footnote in *Crawford, ante,* at 544, *viz:*

The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.

*Crawford*, 541 U.S. at 59 n. 9, 124 S.Ct. at 1369 n. 9. At that point in the opinion, Justice Scalia was responding to concerns expressed in Chief Justice Rehnquist's dissenting opinion that the reliability of some out-of-court statements "cannot be replicated even if the declarant *testifies to the same matters in court.*" *Id.* (emphasis added). Obviously, both Justice Scalia and Chief Justice Rehnquist were assuming that the declarant would testify, but the

Chief Justice believed that the prior statement might be more reliable than the in-court testimony. Immediately prior to this discussion, footnote 9 also states:

> Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. *See California v. Green,* 399 U.S. 149, 162, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

*Id.* The issue in *Green* was whether a testifying witness's prior inconsistent statement could be introduced during the witness's own testimony. The Court held that the statement was admissible under those circumstances. However, the Court also had some cogent things to say about the right of Confrontation:

> Our own decisions seem to have recognized at an early date that it is this literal right to "confront" the witness at the time of trial that forms the core of the values furthered by the Confrontation Clause:

> "The primary object of the constitutional provision in question was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States,* 156 U.S. 237, 242–243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895).

> Viewed historically, then, there is good reason to conclude that the Con-frontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is *testifying as a witness* and subject to full and effective cross-examination.

> This conclusion is supported by comparing the purposes of confrontation with the alleged dangers in admitting an out-of-court statement. Confrontation: (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth" [citing 5 Wigmore § 1367]; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green,* 399 U.S. 149, 157–158, 90 S.Ct. 1930, 1934–35, 26 L.Ed.2d 489 (1970) (emphasis added) (footnote omitted).

Accordingly, I dissent from the affirmance of Peak's conviction and would remand his case for a new trial. I also believe it was unnecessary for the Commonwealth to introduce the putrid death wrappings in which the victim's body had decomposed. While this evidence was being displayed to the jury, an assistant to the prosecutor can be seen spraying the object with a deodorizer; an assistant to counsel for Meeks can be seen holding her nose; and unidentified persons can be heard gagging in the background. However, because no specific objection was registered to the display of this evidence, I would not reverse on that ground.

LAMBERT, C.J.; and SCOTT, J., join.